### A01A1614. LOPEZ v. THE STATE.
(557 SE2d 1)

SMITH, Presiding Judge.

Vincent Lopez was indicted by an Appling County grand jury on one count of armed robbery. He was convicted, his amended motion for new trial was denied, and he appeals, asserting five enumerations of error.[1] Finding no error, we affirm.

1. In two enumerations of error, Lopez raises the general grounds. The parties agree that the State's case rests upon circumstantial evidence.

> Proof by direct evidence, however, is not required. A conviction may be based upon circumstantial evidence if the proved facts are not only consistent with the hypothesis of guilt, but exclude every other reasonable hypothesis but the guilt of the accused. OCGA § 24-4-6. When the evidence meets this test, circumstantial evidence is as probative as direct evidence, and whether this burden has been met is a question for the jury. When the jury is authorized to find that the evidence, though circumstantial, excluded every reasonable hypothesis except the defendant's guilt, the verdict will not be disturbed unless the verdict is insupportable as a matter of law. Further, while circumstantial evidence must exclude every other *reasonable* hypothesis but the defendant's guilt, the evidence need not exclude every inference or hypothesis.

(Citations and punctuation omitted; emphasis in original.) *Hayes v. State*, 249 Ga. App. 857, 860 (1) (549 SE2d 813) (2001).

---

[1] We note that Lopez has failed to subdivide or number the arguments in his brief in any manner, in violation of Court of Appeals Rule 27 (c) (1). To the extent that we are able to discern the specific arguments raised, we have addressed them.

Viewed in the light most favorable to the jury's verdict, the record shows that on December 5, 1999, about 7:30 p.m., a convenience store employee was robbed by a masked man wielding a knife. The robber was wearing a dark-colored hood or hat over his head, a dark blue and white bandanna around his face, dark trousers, a blue and white sweater, and gloves. The victim also noticed that he had a "dark colored complexion" and was "small-built." In addition to taking approximately $3,000 from the store, the robber also took the victim's purse.

A witness testified that as she was preparing to enter the convenience store, she saw a man leave the store with something like a purse or a bag under his arm. She immediately suspected that "something was wrong" because the man was "bundled up" although it was "not that cold out here." He was wearing a knit hat pulled down over his face and a sweater pulled up so his face was concealed. He walked around the corner of the building toward Lennox Road, which runs along the side of the convenience store. The cashier signaled that she had been robbed, and the witness called 911. When the witness drove to the store down Lennox Road, she did not see any cars parked on the side of the road near the store.

Another witness lived approximately three miles from the scene of the robbery and next to another convenience store. Shortly before 6:00 p.m. on the day of the robbery, this witness saw a car parked across from his wife's fish pond in a pine thicket between his home and the store. He went out and asked the driver what he was doing there, and the driver responded that they were "squirrel hunting" although the witness saw no firearms in the car. The witness told the driver to leave. He observed that the driver was a dark-skinned man and that two children or teenagers were with him. Later that day, this witness gave the sheriff's department a description of the car, including three of its license plate characters. His description of the occupants matched a description of the individuals who had been sitting under a tree near the store that was robbed. From the information provided by this witness, a deputy sheriff identified a car owned by one of Lopez's relatives. The deputies located the car on the same evening, and the relative gave them permission to search it. During the search, the deputies found a black toboggan hat, a pair of cloth gloves, and a blue and white bandanna hidden behind the armrest in the backseat. Lopez was at his relative's home with his fiancée and his children when the officers arrived that evening. Based on information his relative provided, the officers arrested Lopez.

At trial, the victim was shown the hat, gloves, and bandanna obtained by the officers. She testified that the bandanna had the same print as that worn by the robber. She could not identify the black hat as the one worn by the robber; she remembered only that it

was dark in color. The gloves looked familiar. The eyewitness was shown the hat found by the officers and testified that the robber used "a hat like that." Lopez's fiancée offered an explanation for the presence of the hat, gloves, and bandanna in the car, claiming that she owned the gloves and bandanna and left them in the car "all the time" and that the hat belonged to her cousin.

While the dissent correctly points out that Lopez did not testify at trial, he did give two statements that were admitted into evidence and recounted his version of events on the evening of the robbery. At trial, a deputy summarized an oral statement Lopez gave less than six hours after the robbery as follows:

> [E]arlier today he and his two boys . . . went back to the BP station, which is the U. S. 1 Convenience Store, where the car broke down and wouldn't crank. This was around three p.m. . . . They finally got the car cranked back up and they come back to town. He put the boys out. He went back uptown, picked up another subject that he call "Poo-Poo." They drove out in the country and "Poo-Poo" told him to stop at this store, so he said he pulled alongside of the store next to Lennox Road — didn't pull into the store, he pulled up side of the road there on Lennox Road. He said the boy went into the store and he came back out and he said he jumped in the back seat of the car and told him — said he had a bag under his arm and he jumped in the back seat of the car and he left. And he said they continued on down Lennox Road and then turned back right on Ten Mile and went back home. He said he didn't know that the boy was going to rob the store.

The defendant also stated that he thought "Poo-Poo" had stolen some beer.

After learning that "Poo-Poo" was James Wicker, the officers interviewed Wicker and searched his home. Wicker testified at trial, denying participation in the robbery and stating that he did not even see Lopez on the night in question. A deputy also testified that Wicker had an alibi for the evening of the robbery and that he personally verified the alibi by interviewing Wicker's alibi witness "without him [Wicker] being able to contact her."[2]

---

[2] On cross-examination, Lopez elicited that Wicker did not have an alibi witness for the hours between 6:00 and 9:00 p.m., but the deputy responded that they were satisfied that Wicker was telling the truth, because they had searched his house and verified his whereabouts up until the time he "said that he was home in bed and that's where he was at when we found him."

The next day, a Georgia Bureau of Investigation agent interviewed Lopez. At trial, this agent summarized Lopez's oral statement as follows:

> Said he was driving his vehicle Sunday evening . . . and he was riding around and he met up with James Wicker and James Wicker got into the car with him. They were riding around. Mr. Wicker asked him to head out to the country. On the way out to the country they stopped at the — or Mr. Wicker asked Mr. Lopez to take a right by the BP store which is U. S. Number 1 Convenience Store. Mr. Wicker advised that he was going to use the bathroom and get something from the store. Mr. Lopez stated that he did not park right in front in the parking lot, he parked next to the road on the side of the road next to the road of the store while Mr. Wicker went inside. Some time afterwards Mr. Wicker walked casually out of the store holding a brown paper sack under his arm. And when Mr. Wicker approached Mr. Lopez's car, he got into the back seat of the vehicle and laid down so nobody could see him and told Mr. Lopez to drive. Mr. Lopez stated he was under the impression that Mr. Wicker may have stolen some beer or something, but he did not ask what he did, what he took — or he did not ask any questions. Mr. Lopez stated he thought it was very strange that Mr. Wicker would get into the back seat of the car after riding up to the store in the front seat, you know, with no one occupying the front seat. He thought that was very strange. After they left the area of the store Mr. Lopez stated that he was on the way to take Mr. Wicker to his residence. And on the way there, Mr. Wicker climbed over the front seat and remained seated in the front passenger seat until he was dropped off at home. Mr. Lopez also stated that he did not know that Mr. Wicker was going to rob the store and he was just in the wrong place at the wrong time. He gave a description. He said Mr. Wicker was wearing black jeans, a dark multicolored sweater, some type of design on it, and a black toboggan-like hat. He also stated that he had a white and blue bandanna hanging out of his back pocket. Mr. Lopez further stated that he did not receive anything from Mr. Wicker, did not realize what Mr. Wicker did until after the fact occurred.

The accumulated evidence, taken as a whole, contains significant contradictions. Lopez's statements to the deputies and the GBI contain many facts that contradict the testimony of other witnesses.

An eyewitness to the robbery testified that she saw no car on the side of the road where Lopez claimed to have waited for Wicker. Lopez's statement to the GBI agent was significantly different from his first statement. He elaborated on his suspicions of Wicker and for the first time added a detailed description of his attire which included the knit hat, sweater, dark pants, and blue bandanna. This new description tallied almost exactly with the descriptions of the robber given to the officers. The testimony of Lopez's fiancée casts doubt upon Lopez's assertion that Wicker was the robber without any connivance on Lopez's part. Wicker would have been unlikely to request a ride from Lopez in casual fashion and then fortuitously find a ready-made disguise in the backseat. This testimony also contradicts Lopez's statement to the GBI identifying these items as Wicker's.

Finally, and most importantly, Wicker's testimony that he did not commit the robbery and was not even present at the scene, supported by the testimony of the deputy, completely contradicts Lopez's explanation that he was simply an innocent and unwitting bystander to Wicker's crime. While Lopez presented evidence that Wicker was a felon and drug offender and argued that he had a strong motivation to lie because he was on parole, the jury nevertheless could have chosen to believe Wicker's testimony in preference to that of Lopez. The jury could have considered the contradictions between Lopez's earlier statements and the testimony at trial as evidence of his untruthfulness generally, deciding that Lopez provided not only the getaway car and the disguise, but perpetrated the robbery alone and attempted to fix the blame on Wicker, a likely suspect because of his prior criminal record. Believing some but rejecting other parts of his testimony, *Hicks v. State*, 221 Ga. App. 735, 736 (1) (472 SE2d 474) (1996), the jury could have concluded that Lopez was truthful in placing himself at the scene of the crime, but untruthful in denying his participation, whether alone or in concert with Wicker. Compare *Krull v. State*, 211 Ga. App. 37 (438 SE2d 152) (1993), in which the defense offered a witness who gave an uncontradicted and unimpeached innocent explanation for the alleged criminal conduct, which was corroborated by another witness. Here, the defense theory and the fiancée's testimony contradict each other, and both were contradicted by Lopez's prior statements and the testimony of Wicker, so it cannot be said that either proposed innocent explanation was "uncontradicted."

While the dissent argues that these contradictions in Lopez's alternative explanations of the circumstantial evidence of his guilt are "vague" and "speculative," that is precisely the issue of reasonableness that the jury, not this court, is empowered to decide. In such circumstances, "the jury is the best doctor of doubt." (Citation and punctuation omitted.) *Frye v. State*, 189 Ga. App. 181, 182 (375 SE2d

101) (1988). The evidence was sufficient to authorize the jury to find Lopez guilty of armed robbery under the standard set forth in *Jackson v. Virginia*, 443 U. S. 307 (99 SC 2781, 61 LE2d 560) (1979).

2. Lopez also contends that the trial court erred in admitting his custodial statements into evidence.

> The burden is on the prosecution to show the voluntariness of a custodial statement by a preponderance of the evidence. Factual and credibility determinations of this sort made by a trial judge after a voluntariness hearing must be accepted by appellate courts unless such determinations are clearly erroneous.

(Citations and punctuation omitted.) *Tucker v. State*, 231 Ga. App. 210, 212 (1) (a) (498 SE2d 774) (1998). The evidence submitted in the voluntariness hearing supports the trial court's denial of Lopez's motion to suppress his statements. The officers testified that Lopez was advised of his rights, understood and waived them, and gave his statements voluntarily. While Lopez claimed that he was under the influence of alcohol at the time of his first statement, that he was promised benefits and threatened, that the officers ignored his request for counsel, and that the GBI agent tricked him into signing the form stating that he had not been threatened, the officers disputed Lopez's account. "In such cases where the testimony is in dispute, the trial court's determinations of fact and credibility relating to the admissibility of a confession will be upheld on appeal unless clearly erroneous." (Citation and punctuation omitted.) *Wells v. State*, 237 Ga. App. 109, 112-113 (3) (514 SE2d 245) (1999). The trial court's findings were not clearly erroneous, and we find no error in the admission of Lopez's custodial statements.

3. Lopez argues that his counsel was ineffective in failing to make an opening statement and in failing to object to evidence of his presence at the other convenience store approximately one and one-half hours before the robbery. To prevail on an ineffectiveness claim, an appellant has the burden of showing both that trial counsel's performance was deficient and that, but for this deficiency, a substantial likelihood exists that the outcome of the trial would have been different. *Head v. Carr*, 273 Ga. 613, 615-616 (4) (544 SE2d 409) (2001). "We note at the outset that [Lopez] has failed to provide a transcript of the hearing on his motion for new trial, so we are unable to address any matters which may appear there but not in the trial transcript." (Footnote omitted.) *Sanders v. State*, 245 Ga. App. 701, 703 (4) (538 SE2d 772) (2000).

While Lopez contends that no tactical reason existed for his trial counsel to omit an opening statement, the trial transcript reveals

that Lopez's trial counsel subpoenaed at least five witnesses who did not testify. At a noon recess during the testimony of the State's penultimate witness, Lopez's trial counsel announced that he had decided not to call these five witnesses and had released them from their subpoenas. Uncertainty regarding the evidence to be presented by the State or the need for particular witnesses could provide a valid reason to omit an opening statement, so as not to promise the jury testimony that might not be presented. In this case, the caution of Lopez's counsel apparently was justified, as he determined in the middle of the State's case that he would not call five witnesses. In the absence of a transcript of the motion for new trial or testimony from trial counsel, we conclude that Lopez has not met his burden of showing any deficiency in what appears to be a tactical decision on the part of trial counsel.

Lopez also contends trial counsel was ineffective in failing to object to what he terms irrelevant evidence regarding his presence near another convenience store shortly before the robbery. But this evidence was directly relevant to the State's theory that Lopez was "casing" a number of convenience stores before committing the robbery and also to explain the conduct of the officers in their investigation and arrest of Lopez. See generally *Odom v. State*, 243 Ga. App. 227, 230 (1) (c) (531 SE2d 207) (2000). While Lopez continues to argue that his statement to police was an "illegal, post arrest statement," it was ruled admissible in the pretrial *Jackson-Denno* hearing; we have affirmed that decision by the trial court in Division 2, above. And, as noted in Division 1, above, the jury was free to believe portions of Lopez's statement and disbelieve others. Lopez has failed to meet his burden of showing ineffectiveness on this ground as well.

4. Finally, Lopez complains that his sentence should be reduced. Although his argument is not entirely clear, he apparently contends that the trial court failed to entertain his motion for reduction in sentence due to untimeliness. But Lopez filed his motion for reduction in sentence as part of his amended motion for new trial, and the trial court's order plainly states that "the defendant's motion for new trial or reduction in sentence" is denied, without reference to timeliness or jurisdiction. In the absence of any further evidence or argument from the record, Lopez has not demonstrated that the trial court abused its discretion in declining to reduce his sentence. See generally *Murray v. State*, 216 Ga. App. 593, 596 (2) (455 SE2d 79) (1995).

*Judgment affirmed. Blackburn, C. J., Pope, P. J., Eldridge and Mikell, JJ., concur. Barnes and Phipps, JJ., dissent.*

BARNES, Judge, dissenting.

I respectfully dissent because the circumstantial evidence in this case fails to exclude every other reasonable hypothesis of Lopez's

guilt beyond a reasonable doubt. No one identified Lopez as the robber. The police failed to locate the knife used in the robbery, the distinctive sweater worn by the robber, or the proceeds of the crime in a search of Lopez's home and his grandmother's car just hours after the robbery. The only evidence linking him to the robbery in any way was the hat, gloves, and bandanna found in the car he had driven earlier in the day and the statement he gave to police implicating Wicker.[3]

The State argues that this evidence shows Lopez was a party to the crime under OCGA § 16-2-20 which provides:

> (a) Every person concerned in the commission of a crime is a party thereto and may be charged with and convicted of commission of the crime. (b) A person is concerned in the commission of a crime only if he: (1) Directly commits the crime; (2) Intentionally causes some other person to commit the crime under such circumstances that the other person is not guilty of any crime either in fact or because of legal incapacity; (3) Intentionally aids or abets in the commission of the crime; or (4) Intentionally advises, encourages, hires, counsels, or procures another to commit the crime.

This argument fails because no evidence shows that Lopez did any of these things. "Presence at the scene of a crime is not sufficient to show that a defendant is a party to the crime under OCGA § 16-2-20. [Cits.] Even approval of the act, not amounting to encouragement, will not suffice." *Brown v. State*, 250 Ga. 862, 864 (1) (302 SE2d 347) (1983).

An accessory after the fact is not a party to a crime under OCGA § 16-2-20, but instead "is guilty of a separate, substantive offense in the nature of an obstruction of justice." *Moore v. State*, 240 Ga. 210, 212 (1) (240 SE2d 68) (1977). Thus, one who drives a murderer from the scene of the crime after learning that a murder was committed is guilty of accessory after the fact. *Moore v. State*, 94 Ga. App. 210, 215 (1) (94 SE2d 80) (1956). "In essence, to be guilty as a party to a crime as an aider or abettor pursuant to OCGA § 16-2-20 (b) (3), a defendant must be an accessory *before* the fact." (Emphasis supplied.) *Purvis v. State*, 208 Ga. App. 653, 654-655 (433 SE2d 58) (1993).

In this case, Lopez's statement, taken at face value, shows only that he was present at the scene of the armed robbery, but had no knowledge that it was going to occur. The statement, along with his

---

[3] Although direct admissions of the crime charged are not circumstantial evidence (*Bigham v. State*, 222 Ga. App. 353, 354 (474 SE2d 254) (1996)), admissions of fact from which an inference of participation arises are circumstantial only. *Eberhart v. State*, 47 Ga. 598, 609 (1873); *Riley v. State*, 1 Ga. App. 651, 655 (57 SE 1031) (1907).

fiancée's testimony, also provides an innocent explanation for the presence of the evidence later found in the car he drove. On the other hand, one could also infer from Lopez's statement and the evidence found in the car that he was not only present, but a party to the armed robbery. He might have known Wicker's intentions in advance and been a willing participant. Thus, we are faced with deciding whether this evidence excluded "every other reasonable hypothesis save that of the guilt of the accused." OCGA § 24-4-6. We recognize that this is

> primarily a question for determination by the jury. This of necessity is so, for we have no legal yardstick by which we can ordinarily determine what in a given case is a reasonable hypothesis, save the opinion of twelve upright and intelligent jurors. After having heard the witnesses and having observed them testify, they are more capable of judging of the reasonableness of a hypothesis produced by the evidence, or lack of evidence, and the defendant's statement, than is a court of law. However, this court is a court of law, [and] where there appears a hypothesis from the evidence, or from the lack of evidence and the defendant's statement, pointing to the innocence of the accused, and which tested by all human experience is a reasonable one, [we] may declare it so as a matter of law.

(Punctuation omitted.) *Wood v. State*, 156 Ga. App. 810, 811-812 (1) (275 SE2d 694) (1980).

In my view, the evidence does not exclude a reasonable hypothesis of innocence, and the alleged contradictions in the evidence do not alter this conclusion. Furthermore, many of the alleged contradictions outlined by the majority are not actually so. Lopez did not testify at trial and gave no written or recorded pre-trial statements. The fact that the Georgia Bureau of Investigation agent's trial summary of Lopez's oral statement contains additional information, consistent with the sheriff's trial summary of a different interview, does not mean that Lopez gave inconsistent statements. The GBI agent might have remembered more about what Lopez told him; the GBI agent might have conducted a better interview, obtaining more information from Lopez; or the law enforcement officers' view of what information was important may have differed. What is certain is that Lopez did not control the scope of these witnesses' testimony.

Likewise, the fiancée's testimony that the items kept in the car "all the time" belonged to her or her cousin does not contradict Lopez's pre-trial statement that he saw Wicker wearing similar items after he had been in the car where these items were kept. Moreover,

there is no direct evidence that Wicker actually wore the items in the car or that the items found in the car were actually used in the robbery. The robbery took place in December, a cold-weather month, and the items found in the car were not unusual or unique.

If our task were only to measure whether the circumstantial evidence could be construed in a manner sufficient to sustain Lopez's guilt, I would reach a different result. We must also decide, however, whether the circumstantial evidence was sufficient to exclude every other reasonable hypothesis save that of Lopez's guilt. The vague, speculative evidence introduced in this case simply does not meet this test as a matter of law. The evidence shows that Wicker may have robbed the store without Lopez's knowledge that he intended to do so, and no evidence was presented excluding this reasonable hypothesis of innocence.

"The most fundamental premise of our criminal justice system is that a person ought not to be punished for a criminal offense until the state demonstrates guilt beyond a reasonable doubt. [Cit.]" (Punctuation omitted.) *Ayala v. State*, 262 Ga. 704, 706 (1) (425 SE2d 282) (1993). Because this burden was not met in this case, I must respectfully dissent.

I am authorized to state that Judge Phipps joins in this dissent.

DECIDED NOVEMBER 30, 2001.

*John S. Wetzler*, for appellant.
*Stephen D. Kelley, District Attorney, Jan Kennedy, Assistant District Attorney*, for appellee.